# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DAVID SHAUN NEAL

      Plaintiff,

v.

ASTA FUNDING, INC., GARY
STERN, MARY CURTIN, SETH
BERMAN, CYNTHIA SCHATZMANN
(HORVAT), LOUIS PICCOLO, DAVID
CAVILL, and JOHN DOES 1-10,

      Defendants.

Case No.: _13-3438 (KM)_

Civil Action

**COMPLAINT AND JURY DEMAND**

Plaintiff David Shaun Neal complains of Defendants, as follows:

RECEIVED

JUN 03 2013

AT 8:30_____M
WILLIAM T. WALSH, CLERK

## PARTIES

1.      Plaintiff, David Shaun Neal ("Neal"), is a natural person at all times residing in

the State of New York, at 18 Susan Ct, Town of Tuxedo, County of Orange, State of New York

10987.

2.      Defendant, ASTA Funding, Inc. ("ASTA"), is a Delaware corporation with its

principal offices at 210 Sylvan Avenue, Borough of Englewood Cliffs, County of Bergen, State

of New Jersey 07632.

3.      Defendant, Gary Stern ("Stern"), is an individual believed to reside in the State of

New Jersey, with offices and doing business at 210 Sylvan Avenue, Borough of Englewood

Cliffs, County of Bergen, State of New Jersey 07632.  Stern is the Chief Executive Officer of Defendant ASTA.

4.      Defendant, Mary Curtin ("Curtin"), is an individual believed to reside in the State of New Jersey, with offices and doing business at 210 Sylvan Avenue, Borough of Englewood Cliffs, County of Bergen, State of New Jersey 07632.  Curtin is the Senior Vice President of Defendant ASTA.

5.      Defendant, Seth Berman ("Berman"), is an individual believed to reside in the State of New Jersey, with offices and doing business at 210 Sylvan Avenue, Borough of Englewood Cliffs, County of Bergen, State of New Jersey 07632.  Berman is the General Counsel of Defendant ASTA.

6.      Defendant, Cynthia Schatzmann (Horvat) ("Schatzmann"), is an individual believed to reside in the State of California.  Schatzmann is a former employee of ASTA and is believed to be a current employee of ASTA with offices and doing business at 210 Sylvan Avenue, Borough of Englewood Cliffs, County of Bergen, State of New Jersey 07632.  Upon information and belief, the residence address for Schatzmann is known by Defendant Stern.

7.      Defendant, Luis Piccolo ("Piccolo"), is an individual believed to reside in the State of New York with offices and doing business at 210 Sylvan Avenue, Borough of Englewood Cliffs, County of Bergen, State of New Jersey 07632.   Piccolo is a current independent director of ASTA.

8.      Defendant, David Cavill ("Cavill"), is an individual believed to reside in the State of New Jersey with offices and doing business at 210 Sylvan Avenue, Borough of Englewood Cliffs, County of Bergen, State of New Jersey 07632.  Cavill is a current employee of ASTA.

9.     Defendants John Does 1-10, being fictitious names, are individuals who aided in, participated in, committed, conspired to commit, facilitated, abetted or otherwise liable for the actions complained of herein whose identities have not yet been discovered.

## JURISDICTION

10.     Plaintiff repeats and re-allege each and every allegation contained in Paragraphs 1 through 9 of the Complaint as if set forth herein verbatim and at length.

11.     Plaintiff Neal brings causes of action under the Sarbanes-Oxley Act 18 U.S.C. § 1514A, et. seq., as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act 15 U.S.C. § 78u-6, et. seq.

12.     Plaintiff Neal brings causes of action under the 12 U.S.C. § 5567 (a) et. seq., as amended.

13.     Pursuant to 15 U.S.C. § 78aa, "[t]he district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."

14.     Therefore, New Jersey's District Court has jurisdiction over this matter based upon diversity jurisdiction pursuant to 28 U.S.C. § 1331.

15.     Plaintiff, Neal, resides in, and therefore is a citizen of, New York.

16.     Defendant, ASTA, is incorporated in Delaware and has its principal place of business in New Jersey.  Therefore, pursuant to 28 U.S.C. § 1332(c)(1) ASTA is a citizen of New Jersey and Delaware.

17.     Defendant, Stern, is believed to be a resident and citizen of New Jersey.

18.     Defendant, Schatzmann, is believed to be a resident and citizen of California.

19.     Defendant, Piccolo, is believed to be a resident and citizen of New York.

20.     Defendant, Cavill, is believed to be a resident and citizen of New Jersey.

21.     The matter in controversy exceeds $75,000.

22.     Therefore, New Jersey's District Court also has jurisdiction over this matter based upon diversity jurisdiction pursuant to 28 U.S.C. § 1332.


## VENUE

23.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 22 of the Complaint as if set forth herein verbatim and at length.

24.     Pursuant to 28 U.S.C. §1391, New Jersey is the proper venue for this matter because Defendants reside in the State of New Jersey.

25.     Further, New Jersey is the proper venue for this matter pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims in this matter occurred within New Jersey; and Plaintiff, Neal worked for ASTA at its offices in New Jersey.


## PROCEDURAL HISTORY

26.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 25 of the Complaint as if set forth herein verbatim and at length.

27.     Plaintiff timely filed a complaint pursuant to 18 U.S.C. §1514A and 12 U.S.C. §5567 with the Secretary of Labor, Occupational Safety and Health Administration on November 28, 2012.

28.     Plaintiff's complaint was administratively denied on March 26, 2013.

29.     Plaintiff timely filed an objection to the findings and request for hearing on April 22, 2013.

30.     More than 180 days have passed since the initial complaint was filed and no final determination has been issued by the Secretary of Labor and the delay is not due to the bad faith of the Plaintiff.

31.     Not more than 90 days have elapsed from the date of receipt of a written determination from the Secretary of Labor.  The Plaintiff has not delayed the proceedings in bad faith.

32.     Accordingly, Plaintiff is entitled to de novo review of this matter in a District Court of competent jurisdiction pursuant to 12 U.S.C. §5567 (c)(4)(D)(i) and 18 U.S.C.  §1514A (b)(1)(B).

## FACTS RELEVANT TO ALL COUNTS

33.     Plaintiff repeats and re-alleges each and every allegation contained in Paragraphs 1 through 32 of the Complaint as if set forth herein verbatim and at length.

a.  **Neal's employment at ASTA**

34.     On or about July 1, 2004, Plaintiff, Neal, and Defendant, ASTA, entered into a contract for his employment by ASTA.

35.     Plaintiff Neal responded to a NY Times newspaper ad for "IT Director".

36.     During the interview, ASTA inquired about the salary requirements of Neal.

37.     Neal stated that he had historically made between $275,000 and $460,000 per year and that a similar compensation level would be acceptable.

38.     The parties subsequently agreed that the salary for Neal would be a base salary of $120,000 per year with a performance related bonus of not less than $120,000 per year.

39.     Neal was employed to perform a complete overhaul of the ASTA technology infrastructure.

40.     After three weeks of employment, Neal was instructed by Stern and other senior management at ASTA, to terminate all of the existing technology support staff at once.

41.     Although Neal advised against this, Stern insisted.

42.     The termination of all the current technology staff created a dangerous situation for ASTA which put ASTA at risk for operational failures.

43.     Neal advised Stern and others at ASTA verbally and by email that this dangerous situation existed.

44.     Despite having virtually no information or support from the prior technology staff, Neal was able to operate some of the systems at ASTA.

45.     During this time, Stern expressed dissatisfaction with Neal's performance despite the impossible situation which had been self-imposed by ASTA management.

46.     Stern subsequently hired a contractor to "help" Neal.

47.     However, the contractor was unable to perform relevant services.

48.     Ultimately, Stern refused to pay the contractor; the contractor sued ASTA and prevailed at trial.

49.     However, Stern continued to impose an impossible situation on Neal by refusing to allocated budget for sufficient technology support.

50.    The lack of a proper level of funding would persist for the 8 years which Neal was employed at ASTA.

51.    At the end of the first year, Neal inquired to his superior, then CFO Mitchell Cohen regarding his year-end bonus.

52.    Cohen informed Neal that Stern refused to pay the bonus even though it has been previously agreed to.  Instead, Stern authorized a payment of $10,000 to Neal.

53.    Aside from a stock grant worth approximately $8,000, Neal received no other bonus payments.

54.    In 2006, ASTA requested that Neal form a company to provide technology subcontract services to ASTA.

55.    Cohen agreed with Neal, that Neal would be entitled to make a profit on the technology services in lieu of receiving a bonus.

56.    In effect, the profit earned on the subcontract services became part of Neal's compensation per the amended agreement.

57.    In June of 2009, this agreement was memorialized in writing between Neal (though his company New World Solutions, Inc) and ASTA.

58.    The ASTA Contract was drafted by counsel for ASTA, and presented for acceptance by NWS.

59.    The ASTA Contract obligated ASTA to pay NWS for various "Basic Services" to be provided to ASTA by NWS, as outlined in Addendum A.

60.    The ASTA Contract required that NWS be the "exclusive provider" of these Basic Services for the term of the ASTA Contract.

61.     The ASTA Contract also required the designation of a "Point of Contact" for both NWS and ASTA.

### b.  Nature of Neal's Employment with ASTA

62.     Neal provided a wide range of services to ASTA, from business advice on the business's strategy and procedure to signing contracts on ASTA's behalf and at their direction.

63.     Neal's work was fully integrated in the ASTA system, providing a range of services which allowed ASTA to continue its business.

64.     Neal performed tasks relating to the offering or provision of consumer financial products.

65.     Neal performed tasks relating to the offering or provision of consumer financial services.

66.     Neal created and transmitted consumer credit report files.

67.     Neal designed and maintained consumer credit reporting systems.

68.     Neal was routinely involved in the investigation and resolution of consumer balance disputes.

69.     Neal was involved in numerous tasks on a daily basis relating to the offering and provision of consumer financial products for ASTA.

70.     As such, Neal is a Covered Employee pursuant to 12 U.S.C. § 5567 (b).

71.     ASTA is largely a debt acquisition and collection company.  However, its system is almost entirely computer-based.

72.     Therefore, Neal was an integral part of the business.

73.     ASTA controlled both the means and manner of Neal's performance.

74.   Neal reported to his supervisors at ASTA.

75.   While Neal's position as the Director of IT was a highly skilled position which involved less supervision by management than other, less skilled workers, all Neal's work was subject to supervisors' approval at ASTA.

76.   ASTA provided Neal with approximately four weeks of paid vacation each year; Neal had to have his vacation time approved by his supervisors at ASTA.

77.   At that time, Neal was also employed by a company called Bach Consulting.

78.   Neal was a joint employee of Back Consulting and ASTA.

79.   Neal billed ASTA for the time he worked, which was based on a full-time schedule working for ASTA.

80.   Neal's wages were paid by ASTA to Bach Consulting.

81.   Bach Consulting then forwarded payments to Neal.

82.   Bach Consulting did not take any portion of the amount billed by Neal; Neal received the full amount paid for his services by ASTA.

83.   Neal physically worked at ASTA's offices in Englewood, New Jersey, except when he occasionally was asked by ASTA to travel to different locations or when Neal worked from home.

84.   All equipment and workspace was provided by ASTA.

85.   Then in 2007, Bach Consulting dissolved.

86.   However, Neal remained an employee of ASTA and continued to work for ASTA as he always did as their IT Director.

87.   At the time, Neal was a co-owner of NWS.

88.     Thus, after Bach Consulting was dissolved, paychecks from ASTA to Neal went to NWS.

89.     NWS did not take any portion of the amount billed by Neal; Neal received the full amount paid for his services by ASTA.

90.     No contract existed between NWS and ASTA until 2009.

91.     ASTA then wanted to implement a contract between the two companies for IT services.

92.     Therefore in 2009, ASTA and NWS entered into the ASTA Contract for NWS to provide ASTA with IT services.

93.     Neal's responsibilities were not altered by this contract.

94.     Then in 2012 ASTA terminated the ASTA Contract.

95.     However, Neal still expected to work for ASTA following the termination until Neal was suddenly denied all access to ASTA and its systems.

96.     Indeed, neither the dissolution of Bach Consulting, nor the introduction of the NWS and/or the ASTA Contract in any way altered or effected Neal's activities as an employee of ASTA.

97.     Neal's scope of responsibilities and duties were dictated and directed by ASTA.

98.     Neal's employment was terminated by ASTA.


c. **Neal's Whistleblowing and Retaliation by ASTA**

99.     Throughout the term of his employment, Neal had been a vocal critic of the lackadaisical attitude of senior management regarding legal compliance.

100.    Neal repeatedly complained to ASTA that it lacked a compliance officer or even anyone whose official duties were related to compliance.

101.    Over the course of many years, Neal informed senior management at ASTA, including Defendant Stern, of the wrongful, illegal, and/or unethical activity.

FAILURE TO IMPLEMENT WISCONSIN CHAPTER 128 MONITORING

102.    After discovering the issue, Neal informed Stern, Curtin and Berman that ASTA lacked a procedure to monitor its debt collection accounts for Wisconsin State Chapter 128 filings.

103.    A WI 128 filing is the state receivership statute which provides for debtor protections from creditors.

104.    Neal discovered that ASTA had collected payments from debtors who had filed for protection under the statute.

105.    Filing for protection under the statute provides for an automatic stay.

106.    However, because of its lack of procedures, ASTA collected, and continued to collect, payments from debtors who had filed for protection under the act.

107.    Further, in violation of 15 USC 1692, ASTA continued to attempt collection on debtors who filed for protection under the statute.

108.    Neal uncovered payments which had been collected from debtors after the filing for protection and automatic stay had commenced.

109.    Neal suggested to Stern, Curtin and Berman that these payments had been wrongfully collected and should be refunded.

110.    Stern and Curtin refused.  Stern and Curtin stated that refunding the payments would highlight the flaws in their procedure and would invite a "flood of lawsuits".

111.    Berman offered no opinion and "turned a blind eye" to the issue.

112.    The foregoing events are memorialized in email exchanges between Neal and ASTA.

113.    Neal uncovered approximately 2,000 accounts with an approximate aggregate amount of $100,000 which had been improperly collected.

114.    However, ASTA never implemented any system to remedy the procedure and never refunded any of the improperly collected funds, despite have incontrovertible proof that the payments were illegally collected.

115.    Neal informed Stern, Curtin and Berman that he felt this was fraud because ASTA was knowingly keeping payments which had been illegally collected.

116.    However, no action was ever taken.


INCORRECT CALCULATION OF POST JUDGMENT INTEREST

117.    After discovering the issue, Neal informed ASTA that it lacked proper procedures for calculating post judgment interest.

118.    On certain accounts, ASTA would obtain a judgment against the debtor.

119.    ASTA would then collect the judgment amounts, including accrued post judgment interest.

120.    However, Neal uncovered that ASTA was not properly accruing post judgment interest.

121.   Neal also discovered that ASTA was not properly allocating payments to judgment accounts.

122.   Specifically, accrual of post judgment interest differs on a state by state basis.

123.   The application methodology of post judgment payments also differs on a state by state basis.

124.   Neal provided the statutory authorities to Stern, Curtin and Berman via email.

125.   Neal provided detailed implementation plans via email to ASTA to assist in the remedy of the situation.

126.   However, ASTA informed Neal that the process would be too expensive.

127.   Neal provided reports via email to Curtin, Berman and other senior management quantifying the number and amounts of payments which had been incorrectly collected.

128.   Neal determined that several million accounts had incorrect balances and that several hundred thousand dollars had been improperly collected from debtors.

129.   Neal provided this information to senior management by email.

130.   Neal provided detailed refund reports showing at least $750,000 in refunds due to debtors which had been incorrectly collected from them due to improper calculation of post judgment interest and application of post judgment payments.

131.   However, ASTA never refunded any payments.

132.   Neal informed Curtin, Stern and Berman that he felt it was fraudulent for ASTA to retain these payments which had been improperly collected.

133.   However, ASTA never refunded any payments.

134.   Neal was informed that it would be too much liability for the company because it could create substantial litigation against ASTA.

135.   Neal was chastised for spending his time researching the issue.

136.   Although ASTA ultimately remediated some of its system to properly accrue for post judgment interest, ASTA never addressed the improper allocation of post judgment payments.

137.   Stern, and others, stated to Neal that ASTA was not concerned about having the correct judgment balance in their system.

## FAILURE TO PROVIDE REFUNDS TO DEBTORS

138.   Upon discovering the issue, Neal informed Stern, Curtin and Berman that there were several hundred thousand accounts in the system with a negative balance.

139.   A negative balance was indicative of amounts which had been over collected from the debtors and were due as refunds.

140.   However, upon further investigation, Neal determined that some accounts had negative balances for other reasons besides a refund being due.

141.   For example, ASTA lacked a procedure to properly adjust the balance when a returned check (NSF) occurred on an account.

142.   Several other issues in the system resulted in negative balances on accounts where an amount was still actually due.

143.   However, Neal identified several thousand accounts where refunds were actually due to debtors.

144.   Neal informed ASTA by email that approximately $85,000 in total refunds were due to a few thousand debtors.

145.    Neal informed ASTA that there were probably many more debtors owed refunds, but due to their deficient processes, Neal was unable to identify exactly how many.

146.    Stern, Berman and Curtin concluded that there were too many debtors to individually review.

147.    Further, Stern and Curtin informed Neal that no refunds would be issued because it would create too much liability for ASTA.

148.    In receiving a refund, particularly one which was many months or years after the fact, debtors may have been alerted to the lack of proper procedures at ASTA and would then commence litigation against the firm.

149.    Neal informed ASTA that knowingly keeping refunds which were due to debtors could be considered fraud.

150.    However, ASTA never refunded any of the payments identified by Neal.


FAILURE TO PROPERLY ACCOUNT FOR PAYMENTS FROM RECEIVER

151.    Neal discovered a discrepancy in 6,500 payments totaling approximately $1,500,000 which had been received from a third party receiver handling the state bankruptcy of Mann Bracken/Axiant.

152.    In particular, Neal noted that the count and amount of receipts from a trust bank account did not match the details which were transmitted to ASTA from the receiver.

153.    The details were used to update the debtor balances to make sure that the proper amounts were being collected on.

154.    However, the details did not match the amount of remittance or deposits to the trust account.

155.    Over a nine month period Neal attempted to resolve the problem with the receiver.

156.    However, the receiver was combative, unresponsive and generally unhelpful.

157.    Neal documented his attempts to resolve the issue in numerous emails to ASTA.

158.    Ultimately, Neal recommended that ASTA commence litigation against the receiver for their failure to provide proper details.

159.    By failing to provide proper details, the receiver subjected ASTA to liability under 15 USC 1692, because ASTA was collecting on incorrect balances.

160.    In addition, ASTA was unable to identify many payments which the receiver sent, and therefore was unable to apply those payments to debtor balances.

161.    This resulted in ASTA collecting on incorrect balances.

162.    Neal documented these various issues to ASTA in emails.

163.    However, ASTA never took any action to rectify the missing payments.

164.    Additionally, ASTA never commenced any action against the receiver to recover its missing details or missing funds.

165.    ASTA told Neal that commencing an action to recover the funds would highlight the fact that ASTA had incorrect balances in its systems and would therefore subject the firm to litigation liability.

166.    In effect, ASTA was actively concealing that fact that it had incorrect balances on these accounts resulting in violations of 15 USC 1692.

167.    ASTA never resolved the discrepancies in payments or funds received from the receiver.

168.    Stern stated to Neal that he should stop wasting time on these types of efforts.

169.    Neal stated to Stern that his efforts were an attempt to bring the firm in compliance and mitigate any liability.

170.    In reply Stern stated that he did not care if the system balances were correct or not and that it was too expensive to be complaint and it was cheaper to defend a small number of lawsuits against the firm.

## FAILURE TO CEASE COLLECTION ON KNOWN PAID/SETTLED ACCOUNTS

171.    ASTA was named as a defendant in litigation for collecting on an account which had been previously paid in full.

172.    Neal was tasked with investigating the root cause of such collection activity.

173.    During his research, Neal identified 77,000 accounts which had been previously indicated by the seller as fraud, paid in full or settled previously.

174.    However, ASTA had continued to collect on these accounts for several years because the detail file had been lost by ASTA.

175.    Neal identified thousands of payments totaling tens of thousands of dollars which had been collected on these accounts.

176.    Those payments were all improperly collected because the accounts had been paid, settled or deemed fraud by the seller of the accounts.

177.    Neal provided ASTA with a list of the payments via email.

178.    Neal suggested to Curtin, Stern and Berman that these payments should be refunded because they had been improperly collected.

179.    However, Stern stated that no refunds would be made.

180. Stern stated that too much litigation liability could accrue to the firm because, upon receiving the refund, debtors would become aware that ASTA had improperly collected the amounts and could then sue for violations of 15 USC 1692.

181. Neal informed Curtin, Stern and Berman that knowingly keeping payments which had been improperly collected could be considered fraud.

182. However, ASTA never refunded any payments.

183. Additionally, ASTA was never able to fully identify which accounts had been marked by the seller as paid, settled or fraud.

184. Upon information and belief, ASTA continues to knowingly collect on these accounts which have been previously paid, settled or deemed fraud.


FAILURE TO SECURE PERSONAL INFORMATION ON A WEBSITE

185. Neal discovered a security violation in a website managed by Schatzmann.

186. Neal informed Curtin that the website was not secure.

187. The website contained various personal information, including, credit card numbers, medical procedure information, bank accounts numbers, social security numbers and patient home address and phone numbers.

188. Neal informed Curtin by email that a security check should be done to see if any information had been compromised.

189. Neal informed Curtin that various state statutes may require that ASTA inform those people potentially impacted of any possible security breach.

190. Neal suggested to Curtin and Berman that ASTA should pay for a credit monitoring service for those individuals who had potentially been compromised.

191.    However, ASTA never informed any of the individuals that their personal information had been exposed on an unsecure website.

192.    Upon information and belief, no security check was ever performed to determine if any personal information had been compromised.

193.    Schatzmann did not remedy the security issue for several weeks.

194.    Despite knowing that the security issue existed, Schatzmann never disabled the website.

195.    In later emails between Schatzmann and Stern, Schatzmann would make false statements about Neal and suggest to Stern that Neal be terminated.


FAILURE TO REMEDY HISTORICAL THIRD PARTY PAYMENT ERRORS

196.    As part of its core business strategy, ASTA would transmit accounts to third parties for collection.

197.    Those third parties would collect amounts on behalf of ASTA and remit payments and details to ASTA.

198.    ASTA would "shuffle" the accounts among third parties frequently.

199.    In some instances, debtors would make payments to third party servicers for accounts which were no longer with that servicer.

200.    Additionally, debtors would make payments directly to ASTA on accounts which were being handled by third parties.

201.    Both classes of these payments were internally referred to as "direct payments".

202.    In 2005, when ASTA embarked on large scale transmission of accounts to third parties, ASTA lacked any process for handing direct payments.

203.   In 2007, Neal began to research various issues in the system.

204.   Neal informed ASTA that its direct payment process was flawed.

205.   Neal informed ASTA that due to various flaws, amounts had been collected from debtors which were not due to ASTA.

206.   In all, Neal identified over 50,000 accounts for which amounts had been improperly collected.

207.   Neal suggested to Curtin, Stern and Berman that those payments should be refunded to the debtors.

208.   However, ASTA never refunded any of the payments identified by Neal.

209.   Stern stated that too much liability would accrue to the firm if debtors realized that ASTA had collected amounts not due.

210.   Neal informed ASTA that knowingly keeping payments which had been improperly collected could be fraud.

211.   However, ASTA never refunded any of the payments.

212.   Although ASTA reluctantly implemented a procedure to address the various issues after four years of instance by Neal, ASTA never addressed the payments which had been improperly collected.


## FAILURE TO VACATE JUDGMENTS KNOWN TO BE INCORRECT

213.   ASTA was named as a defendant in an action for collection of amounts not owed.

214.   Neal was enlisted to assist in determining the root cause.

215.   Ultimately, Neal and ASTA determined that ASTA's systems contained two types of interest merged into a single interest amount.

216.    Specifically, interest accrued prior to the charge off of an account is referred to as pre-chargeoff interest.  This is interest which can legally be combined into principal when obtaining a judgment.

217.    At the point of charge off, a new total balance is created which becomes the new total principal amount due.

218.    In some instances, either creditors or interim debt purchasers would accrue interest on the principal amount after charge off.  This is called post chargeoff interest.

219.    When obtaining a judgment, the principal amount that is sought can only contain the original charge off amount, which may include pre charge off interest.

220.    However, post chargeoff interest cannot be included in the amount sought for judgment because this would result in compounding of interest when the judgment was obtained.

221.    ASTA discovered that, in some instances, either the creditor or an interim debt buyer had combined pre chargeoff interest and post chargeoff interest into a single amount.

222.    This had occurred on not less than 77 portfolios at the firm covering several million accounts.

223.    Neal further discovered that 130,000 judgments had been obtained on these accounts.

224.    Neal informed Curtin, Stern and Berman that the principal amount of these judgments was incorrect, because it included post chargeoff interest, and therefore post judgment interest was compounding on these judgments, in violation of state and federal law.

225.    Neal further informed ASTA that payments had been made on tens of thousands of these accounts, and that the collection of those payments in some cases was improper because amounts had been paid which were not owed.

226.   Neal informed ASTA that the proper remedy was to vacate these judgments because they had been improperly obtained.

227.   This fact was confirmed by outside third party servicers who had obtained some of the judgments.

228.   The above matters were documented in numerous emails between ASTA, Neal and other third parties.

229.   However, ASTA never vacated the judgments.

230.   ASTA never refunded any of the amounts which were determined to be owed to the debtors.

231.   Stern stated that too much liability could accrue to the firm if word got out that ASTA had obtained judgments on incorrect balances.

232.   Upon information and belief, ASTA continues to collect on these judgments to this day.

233.   Neal informed Stern, Curtin and Berman that knowingly continuing to collect on these judgments could be fraud.

234.   Neal informed Stern, Curtin and Berman that knowingly keeping payments which had been improperly collected could be fraud.

235.   However, ASTA never refunded the payments and ASTA continued to collect on the judgments which it knew to be incorrect.


## FAILURE TO PROPERLY UPDATE KNOWN INCORRECT BALANCES

236.   In 2007 ASTA acquired a portfolio of several hundred thousand accounts known as Great Seneca.

237.   Subsequent to the purchase, the seller of the portfolio informed ASTA that the balances on the entire portfolio had been transmitted incorrectly.

238.   Specifically, ASTA was informed that principal, interest and fees had been improperly combined into a single figure.

239.   Further, the seller stated that they had incorrectly combined judgment amounts into a single figure, including principal, post judgment interest, costs and legal fees.

240.   ASTA attempted to resolve the matter with the seller.

241.   However, due to mismanagement by Curtin, ASTA was never able to update its balances properly.

242.   Despite knowing that the balances were incorrect, ASTA continued to collect on the amounts.

243.   Despite knowing that the balances were incorrect, ASTA obtained judgments on the accounts.

244.   Neal informed Curtin, Berman and Stern that a substantial liability existed because ASTA was knowingly collecting on and obtaining judgments on several hundred thousand accounts which it affirmatively knew had incorrect balances.

245.   However, ASTA continued to collect on the incorrect balances.

246.   ASTA continued to obtain judgments on the incorrect balances.

247.   Upon information and belief, ASTA continues to this day to collect on these incorrect balances.

248.   Neal informed Curtin, Stern and Berman that collecting on known incorrect balances could be fraud.

249.   Neal informed Curtin, Stern and Berman that obtaining judgments on known incorrect balances could be fraud.

250.   However, ASTA never rectified the situation.

## FAILURE TO RECONCILE BALANCES WITH THIRD PARTY SERVICERS

251.   Neal began an effort to reconcile the balances in ASTA system with balances held by third party collection companies.

252.   Neal began this effort in order to help the firm mitigate its litigation risk by making sure that third parties were collecting on correct amounts.

253.   As a result of Neal's efforts, over 15 categories of reconciling issues were identified.

254.   Neal continued to press ASTA to implement the third party reconciliation system.

255.   However, Stern stated that it would cost too much to implement.

256.   Stern stated that he did not care if the balances in the system were correct.

257.   Neal identified thousands of accounts where amounts not due were collected due to third party servicers having incorrect balances.

258.   However, ASTA never addressed the amounts collected that were not due.

259.   Stern and others stated that too much litigation liability could accrue to the firm if anyone found out.

260.   Neal informed Curtin, Stern and Berman that knowingly failing to assure proper balances were being collected on by third parties could be fraud.

261.   However, ASTA never corrected the situation or implemented any system to reconcile its balances with third party servicers.

262.    Upon information and belief, ASTA continues to this day to fail to reconcile its system with that of the third parties who collect on ASTA's behalf.

## FAILURE TO IMPLEMENT CHECKS ON THIRD PARTY TRANSMISSIONS

263.    Cavill implemented a system, through his subordinates, which created debtor files for transmission to third parties.

264.    These files contained lists of debtors and amounts for collection by third parties.

265.    While investigating an unrelated issue, Neal discovered that the process used by Cavill was flawed and resulted in multiple third parties collecting on the same account, in violation of 15 USC 1692.

266.    Further, Neal identified problems with the files produced by Cavill which resulted in incorrect balances being transmitted to the third parties for collection.

267.    This issue was discovered during the third party reconciliation process instigated by Neal.

268.    Cavill was very upset when Neal discovered the issues with his system.

269.    Further, Cavill impermissibly competed with Neal for technology consulting business with ASTA, in violation of Neal's company contract.

270.    Neal informed ASTA that tens of thousands of accounts had been sent to third party servicers incorrectly.

271.    Neal identified thousands of payments which had been improperly collected on those accounts as a result of the improper files being created.

272.    Neal informed Curtin, Stern and Berman, as well as others, that refunds should be issued on those accounts.

273.    However, Stern refused, citing too much litigation liability for the firm.

274.    Later, Cavill would write disparaging and false emails about Neal to Stern and would suggest that Neal should be terminated and replaced.

## FAILURE TO CAPTURE JUDGMENT AWARD AMOUNTS

275.    As part of the process in obtaining a judgment, the court may award a different amount to the creditor that is higher or lower than the amount originally sought.

276.    By reviewing actual judgment copies, Neal determined that an unknown number of judgments in ASTA's systems had incorrect balances.

277.    This was because the court had awarded an amount different from the amount that was requested in the original complaint.

278.    Neal suggested that ASTA should implement a system to collect the award amounts so that the proper balances could be maintained in the system.

279.    Neal suggested that ASTA should review judgment copies of all its judgments to ensure that it was collecting on the correct judgment amounts.

280.    Further Neal warned ASTA that the problem would be compounded by accrual of post judgment interest.

281.    Neal informed ASTA that it might collect significant amounts not due if the system balance were higher than the actual award amount and interest accrued on that balance.

282.    Neal informed ASTA that it may be improperly garnishing wages or bank accounts for amounts not owed due to the foregoing issue.

283.    However, ASTA refused to implement any system.

284.    Stern stated that the cost would be too high.

285.    Instead, ASTA knowingly continued to collect on amounts which it knew to be incorrect and continued to accrue post judgment interest on amounts which it knew to be incorrect.

286.    Neal informed Stern, Curtin and Berman that knowingly collecting such amounts could be fraud.

287.    However, ASTA continued to collect on the amounts.

288.    Upon information and belief, ASTA continues to collect on these incorrect amounts to this day.

## FAILURE TO CALCULATE STATUTE OF LIMITATIONS PROPERLY

289.    ASTA was named as a defendant in an action where the debtor alleged that ASTA brought suit against the debtor after the statute of limitations had expired.

290.    Neal was enlisted to determine the root cause.

291.    Neal determined that ASTA was improperly calculating the statute of limitations expiration date in 27 out of 48 states where it collected.

292.    This comprised over 80% of the active accounts at ASTA at the time, numbering several million accounts.

293.    Berman provided materials to Neal to properly calculate the statute of limitations expiration.

294.    While implementing the new calculations, Neal determined that ASTA had obtained tens of thousands of judgments on accounts which were beyond the statute of limitations at the time the suit was initiated.

295.    Neal documented the list of improperly obtained judgments in emails to Curtin, Stern and Berman.

296.    In effect, ASTA had improperly obtained judgment on tens of thousands of accounts and made material misrepresentations to state courts tens of thousands of times.

297.    Neal suggested that ASTA should vacate these judgments as they were improperly obtained.

298.    However, Stern refused, citing litigation liability to the firm.

299.    ASTA would need to explain to the court why it was vacating the judgment; specifically that it had discovered that the statute of limitations had passed at the time litigation was commenced.

300.    If debtors became aware of this, they might initiate litigation against ASTA for payments made, legal fees or other damages.

301.    Because of the magnitude of the problem, ASTA could be subject to significant litigation risk.

302.    Instead of admitting wrongdoing and fixing the problem, ASTA chose to conceal its mistake.

303.    Upon information and belief, ASTA continues to collect on these judgments to this day.


WIRE FRAUD BY STERN

304.    Upon information and belief, in late 2010, defendant Schatzmann was involved in a divorce.

305.   Upon information and belief, defendant Schatzmann requested that defendant Stern re-direct her salary payments to her son Brandon Horvat.

306.   Upon information and belief, defendant Schatzmann did this to conceal her true income from her adversary in the divorce proceedings.

307.   Upon information and belief, defendant Stern agreed to the scheme of payment redirection.

308.   In late 2010, ASTA ceased payments to Schatzmann and commenced payments to Horvat in the exact same timing and amounts.

309.   Upon information and belief, in November of 2010, ASTA received an anti-money laundering inquiry from its bank regarding the payments to Horvat.

310.   Upon information and belief, Stern affirmatively replied that Horvat was employed by ASTA, at its location in Englewood Cliffs, NJ performing technology services.

311.   Upon information and belief, Horvat was never employed by ASTA in any capacity.

312.   Upon information and belief, Horvat never worked in Englewood Cliffs as stated by Stern to ASTA's bank inquiry.

313.   Upon information and belief, the sole purpose of the payments to Horvat was to conceal Schatzmann's income from her divorce proceedings.

314.   After the bank inquiry, the payments to Horvat immediately ceased and payments to Schatzmann resumed, with the same timing and amounts as before.

315.   Upon information and belief, Stern, the CEO of a public company, willfully conspired with Schatzmann to commit wire fraud by making payments to an individual who was not due those payments.

316.    Upon information and belief, Stern and Schatzmann compounded and attempted to conceal their fraud by making knowing false statements to a bank regulator.

317.    Upon information and belief, Schatzmann and Stern were furious that Neal inadvertently became aware of their apparent fraud during his routine review of technology expenses which listed Horvat as a recipient of payments for technology services.

## OTHER COMPLAINTS

318.    In all, Neal complained to various employees at ASTA of illegal and unethical activity in over 100 instances.

319.    The complaints covered millions of debtors and tens of millions of dollars in incorrect payments and incorrect balances.

320.    In the vast majority of cases, the complaints were documented in emails contained in ASTA's systems and provided highly detailed statements of the issues, the potential liability and identified lists of debtors who had been impacted.

## RETALIATION BY DEFENDANTS

321.    Stern retaliated against Neal by reducing his salary.

322.    Stern retaliated against Neal by terminating his employment

323.    Stern retaliated against Neal by setting impossible goals with limited budget.

324.    Stern retaliated against Neal after his termination by commencing a frivolous and meritless arbitration action against Neal's company.

325.    Curtin retaliated against Neal by transmitting false and disparaging statements to various employees of ASTA including other defendants.

326. Curtin retaliated against Neal by suggesting that Neal's employment be terminated.

327. Berman retaliated against Neal by transmitting false and disparaging statements to various employees of ASTA including other defendants.

328. Schatzmann retaliated against Neal by transmitting false and disparaging statements to various employees of ASTA including other defendants.

329. Schatzmann retaliated against Neal by suggesting that Neal's employment be terminated.

330. Cavill retaliated against Neal by transmitting false and disparaging statements to various employees of ASTA including other defendants.

331. Cavill retaliated against Neal by suggesting that Neal's employment be terminated.

332. Upon information and belief Piccolo was enlisted by Stern to "dig up dirt" on Neal.

333. As an independent director, Piccolo knew, or should have known about the pervasive and widespread fraud perpetrated by ASTA upon the alleged debtors it collected from.

334. Piccolo retaliated against Neal by transmitting false and disparaging statements to various employees of ASTA including other defendants.

335. Upon information and belief, Does 1 to 10 are current or former independent directors.

336. As independent directors, Does 1 to 10 knew, or should have known about the pervasive and widespread fraud perpetrated by ASTA upon the alleged debtors it collected from.

337.    Upon information and belief, Does 1 to 10 retaliated against Neal by transmitting false and disparaging statements to various employees of ASTA including other defendants.

338.    Subsequent to being informed by Neal of its non-compliant, illegal, and/or unethical activities, ASTA began to engage in a systemic pattern of retaliation against Neal individually and NWS.

339.    In February 2011 ASTA informed Neal that "budget cuts" required a reduction in ASTA's staff, requiring Neal's company to terminate several of their employees.

340.    Neal's salary was directly tied to the profit made from his company which was in turn was tied to the number of employees retained by ASTA from NWS .

341.    However, after implementing the staff reductions, ASTA hired at least one former contractor of NWS to work directly for ASTA.

342.    In April of 2011, ASTA implemented a program designed to funnel business away from Neal's company and direct it toward other contractors, in violation of the "exclusive provider" terms of the ASTA Contract with Neal's company (New World Solutions, or NWS).

343.    This program of diverting work from NWS, the "exclusive" provider of Basic Services to ASTA, continued until ASTA terminated the ASTA contract in June of 2012.

344.    As a result of this diversion, Neal was deprived of over $900,000 in wages.

345.    Neal was never paid any of the bonus amounts which had been agreed to by ASTA.

**d.  Breach of the ASTA Contract**

346.    Neal's company NWS had an exclusive contract with ASTA to perform all of the Basic Services, which included virtually all of ASTA's general computer and information technology services.

347.    In March of 2011, David Cavill, sent an email to Neal advising that he would "play traffic cop" for technology requests.

348.    Essentially, he would be taking over some of the Basic Services that NWS would have otherwise provided.

349.    In May of 2011, Andrew Boucher ("Boucher"), informed Neal that ASTA had contracted for the management of technology issues and the use of a program called Celoxis.

350.    Boucher specifically advised that NWS would not be involved in the use of the Celoxis system.

351.    Management of technology issues was a Basic Service listed in the ASTA Contract to be exclusively provided by NWS.

352.    Upon information and belief, ASTA used the Celoxis system to funnel work away from NWS which was to be provided exclusively by NWS.

353.    Upon information and belief, the Celoxis system was selected and implemented by Schatzmann..

354.    Upon information and belief, upon termination of the ASTA Contract by ASTA, ASTA immediately ceased using the Celoxis system.

355.    This further illustrates that ASTA's sole purpose in using the Celoxis system was to redirect work away from NWS which it was otherwise entitled to do and be paid for under the exclusive ASTA Contract.

33

356.    Upon inception of the ASTA Contract, the NWS Point of Contact was Neal and the ASTA Point of Contact was Cameron Williams.

357.    On or about November 6, 2009, ASTA notified NWS that the new Point of Contact for ASTA would be Robert Michel.

358.    The ASTA Contract required ASTA and NWS to meet at least 90 days prior to the termination of the contract to either establish terms for "Transition Services" or to renew the ASTA Contract.

359.    NWS, through Neal, began requesting such a meeting in November of 2011, through ASTA's Point of Contact, Robert Michel.

360.    Upon information and belief, Robert Michel requested meetings with Stern, the CEO of ASTA.

361.    However, despite numerous requests, no such meeting was granted.

362.    Then, in June of 2012, just days before the contract was to expire, ASTA requested a meeting between NWS and ASTA.

363.    However, ASTA would not state whether it wanted to renew the ASTA Contract or arrange for termination services.

364.    At no time prior to June of 2012 did ASTA ever request a meeting pursuant to the contract for termination services, nor did it ever advise that the ASTA Contract was to be terminated.

365.    Upon information and belief, ASTA contracted with a third party company "Sungard" for backup and disaster recovery services.

366.    Backup and disaster recovery services were Basic Services listed in the ASTA Contract to be exclusively provided by NWS.

367.   Upon information and belief, ASTA contracted with a third party company "Nobel Systems" for telephony systems consulting.

368.   Telephony systems consulting was a Basic Service listed in the ASTA Contract to be exclusively provided by NWS.

369.   Upon information and belief, ASTA employed Schatzmann to provide Basic Services, in violation of the exclusive ASTA Contract.

370.   Neal informed Schatzmann of the "exclusive provider" clause of the ASTA Contract.

371.   However, despite being aware of the "exclusive provider" clause of the ASTA Contract, Schatzmann continued to provide Basic Services in violation of the ASTA Contract.

372.   Upon information and belief, Schatzmann also induced ASTA into entering into agreements with other third-parties for Basic Services in violation of the "exclusive provider" clause of the ASTA Contract.

373.   When NWS advised ASTA that it was in breach of the ASTA Contract, ASTA brought a frivolous action in the American Arbitration Association against NWS.

374.   In February of 2011, ASTA informed NWS that NWS had to downsize their staffing due to "budget cuts."

375.   In accordance with this request, NWS prepared a list of contractors to be terminated for ASTA's approval.

376.   Douglas Chyan was one of the contractors to be terminated by NWS.

377.   ASTA approved the list of contractors to be terminated.

378.   As a result, Chyan was terminated on or about February 4, 2011.

379.   Then, on or about March 24, 2011, Stern advised Neal that ASTA had hired Chyan to work for ASTA directly providing Basic Services.

380.   Shortly thereafter, Neal informed Chyan of the "exclusive provider" clause for Basic Services under the ASTA Contract.

381.   However, despite being aware of the "exclusive provider" clause for Basic Services under the ASTA Contract, Chyan contracted with ASTA to provide Basic Services for ASTA in violation of the ASTA Contract.

382.   In March of 2011, NWS advised ASTA's in-house counsel, Seth Berman ("Berman"), that hiring Chyan to perform Basic Services constituted a breach of the ASTA Contract.

383.   NWS also advised Berman of a non-compete clause agreed to by and between NWS and Chyan.

384.   However, no response was received.

385.   In March of 2011, NWS sent a letter to Stern and enclosed a copy of the letter to Berman.

386.   No response was received.

387.   Despite being notified of the breach of the ASTA Contract and the breach of the non-compete clause, ASTA continued, and continues to this day, to retain Chyan as a contractor for Basic Services.

## FIRST COUNT
**(Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act Against All Defendants)**

388.    All of the allegations of paragraphs 1 through 387 are incorporated herein as though repeated verbatim and at length.

389.    ASTA is a publicly traded company.

390.    Neal was an employee of ASTA.

391.    As set forth above, Neal provided information to persons with supervisory authority over him and/or other persons working for ASTA with the authority to investigate, discover, or terminate misconduct.

392.    This information included conduct which Neal reasonably believes constituted violations of 18 U.S.C. 1341, 1343, 1344, the rules and regulations of the Securities and Exchange Commission, and/or federal and state laws relating to fraud against shareholders.

393.    These disclosures by Neal were therefore required and/or protected by section 806 of the Sarbanes-Oxley Act and thus the Dodd-Frank Act.

394.    Defendants violated 15 U.S.C. 78u-6(h)(1)(A) because Plaintiff's protected activity was a contributing factor in their retaliation against Plaintiff.

## SECOND COUNT
### (Violation of 12 USC § 5567 Against All Defendants)

395.    All of the allegations of paragraphs 1 through 394 are incorporated herein as though repeated verbatim and at length

396.    ASTA is a publicly traded company.

397.    Neal was an employee of Asta.

398.    As set forth above, Neal provided information to persons with supervisory authority over him and/or other persons working for ASTA with the authority to investigate, discover, or terminate misconduct.

399.    This information included conduct which Neal reasonably believes constituted violations of 18 U.S.C. 1341, 1343, 1344, the rules and regulations of the Securities and Exchange Commission, and/or federal and state laws relating to fraud against shareholders.

400.    These disclosures by Neal were therefore required and/or protected by 12 U.S.C. § 5567 (a)(4).

401.    Neal was a covered employee pursuant to 12 U.S.C. § 5567 (b).

402.    Neal was an authorized representative pursuant to 12 U.S.C. § 5567, et seq.

403.    Neal objected to the unethical and illegal activities of ASTA.


## THIRD COUNT
### (Violation of New Jersey's Conscientious Employee Protection Act Against Defendants)

404.    All of the allegations of paragraphs 1 through 403 are incorporated herein as though repeated verbatim and at length.

405.    New Jersey's Conscientious Employee Protection Act ("CEPA") forbids employers from taking any retaliatory action against an employee or contractor who discloses, objects to and/or refuse to participate in an activity that he reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, N.J.S.A. 34:19-3(a).

406.    Further, CEPA forbids employers from taking any retaliatory action against an employee or contractor who discloses, objects to and/or refuses to participate in an activity, policy or practice which the employee or contractor reasonably believes is incompatible with a clear mandate of public policy concerning the public health, safety or welfare, or protection of the environment. N.J.S.A. 34:19-3(c).

407.    Neal was a joint employee of NWS and ASTA.

408.    As set forth above, over a period of approximately a year and a half, Neal disclosed, threatened to disclose, objected to, and/or refused to participate numerous illegal, unethical, or otherwise wrongful activities of ASTA.

409.    Plaintiff reasonably believed Defendants' conduct to violate, *inter alia*, HIPAA, the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, various bankruptcy laws, and various related state laws.

410.    As a direct and proximate result of Neal's objections, disclosures, and/or refusals, Defendants harassed Plaintiff, breached the ASTA Contract with NWS, owned in part by Neal, stole NWS's employees and/or contractors, and terminated Plaintiff's employment.

411.    As a direct and proximate result thereof, Plaintiff has been damaged.

412.    Defendants are therefore liable to Plaintiff for violations of CEPA, <u>N.J.S.A.</u> 34:19-3(a), *et. seq.*

## **FOURTH COUNT**
### **(Violation of Public Policy Against All Defendants)**

413.    All of the allegations of paragraphs 1 through 412 are incorporated herein as though repeated verbatim and at length.

414.    As set forth above, Defendant ASTA took adverse actions against Plaintiff Neal, a joint employee, and NWS including the breach of the ASTA Contract and the termination of Neal's employment.

415.    Also, as set forth above, ASTA under took these acts and/or omissions in retaliation for Neal's objections, disclosures, threats to disclose, and/or refusals to participate in conduct which violated various federal and state laws and in violation of public policy.

416.    As a direct and proximate result thereof, Plaintiff has been damaged.

417.    ASTA is thus liable to Plaintiff for these actions in violation of public policy in accordance with  Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980) and its progeny.


### FIFTH COUNT
**(Punitive Damages Against All Defendants)**

418.    All of the allegations of paragraphs 1 through 417 are incorporated herein as though repeated verbatim and at length.

419.    The acts and/or omissions complained of above were actuated by actual malice and/or accompanied by a wanton and willful disregard of Plaintiff, who foreseeably might be harmed by those acts or omissions.

420.    Defendants' actions were especially egregious.

421.    Defendants' supervisory personnel were aware of, authorized, approved of, ratified and/or participated in these acts and/or omissions.

422.    The acts complained of were undertaken by and through Defendant, Stern, who was in upper management. Moreover, the remaining members of upper management actually participated in, ratified, authorized, approved of, and/or acted with willful indifference toward the acts and/or omissions complained of herein.

423.    As a direct and proximate result thereof, Plaintiff has been damaged.

424.    Defendants are therefore liable to plaintiff for punitive damages.


WHEREFORE, Plaintiff, DAVID SHAUN NEAL, demands judgment against all Defendants, for compensatory damages, statutory damages, attorney's fees, costs of suit

incurred, consequential damages, punitive damages, interest and such other and further relief deemed by the Court to be equitable, just and appropriate under the circumstances.

Dated: May 30, 2013          by:   _____
                                          David Shaun Neal

## **JURY DEMAND**

Plaintiff demands a trial by a jury on all counts so triable.

Dated: May 30, 2013          by:          _____

David Shaun Neal